Daniel M. Glassman (SBN 179302)
dan.glassman@klgates.com
Lea E. Gierut (SBN 346884)
lea.gierut@klgates
K&L Gates LLP
1 Park Plaza, Twelfth Floor
Irvine, California 92614
Telephone: (949) 253-0900
Facsimile: (949) 253-0902

Steven L. Caponi (*Pro Hac Vice Pending*)
steven.caponi@klgates.com
K&L Gates LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7080

Falco A. Muscante II (*Pro Hac Vice Pending*)
falco.muscanteii@klgates.com
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Telephone: (412) 355-6500
Facsimile: (412) 355-6501

Attorneys for Plaintiff Dolphin
Entertainment, Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| DOLPHIN ENTERTAINMENT, INC., | Case No.: 2:24-CV-04949 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **1. BREACH OF CONTRACT;** |
| NSL VENTURES, LLC; NSL MEDIA, INC.; SAWYER MEDIA LLC; MARC LUZZATTO; and EVAN LUZZATTO, | **2. DECLARATORY JUDGMENT;** |
| Defendants. | **3. INDEMNIFICATION;** |
| | **4. FRAUD; and** |
| | **5. NEGLIGENCE** |
| | **JURY TRIAL DEMANDED** |

Plaintiff, DOLPHIN ENTERTAINMENT, INC., through its attorneys, files this Complaint against Defendants, NSL VENTURES, LLC ("Seller"), both NSL MEDIA, INC. and SAWYER MEDIA LLC ("Seller Parties"), and both MARC LUZZATTO and EVAN LUZZATTO ("the Luzzattos"), (collectively "Defendants") and states as follows:

## NATURE OF THIS ACTION

1.     This is an action by Plaintiff against Defendants for breach of contract, declaratory judgment, breach of express and common law indemnification, fraud, and negligence, arising from various breaches of contractual representations and warranties.

## JURISDICTION AND VENUE

2.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

3.     Pursuant to § 8.7, a forum selection clause, of the membership interest purchase agreement between Plaintiff and Defendants dated November 14, 2022 (the "MIPA"), this Court has personal jurisdiction over Defendants and venue is appropriate in this Court. *See* Exhibit A, § 8.7.

4.     Pursuant to the choice of law provision in the MIPA, Plaintiff and Defendants agree that these state law claims are governed by the internal laws of the State of Delaware. *See* Exhibit A, § 8.6.

## PARTIES

5.     Plaintiff Dolphin Entertainment, Inc. ("Plaintiff" or "Dolphin") is a Florida corporation, which has a principal place of business at 150 Alhambra Circle, Suite 1200, Miami, Florida 33134.

6.     Defendant NSL Ventures, LLC ("NSL Ventures") is a Delaware limited liability company, which has its registered agent as Harvard Business Services, Inc., 16192 Coastal Highway, Lewes, Delaware 19958.

/ / /

7.     Defendant NSL Media, Inc. ("NSL Media") is a Delaware corporation, which has its registered agent as Harvard Business Services, Inc., 16192 Coastal Highway, Lewes, Delaware 19958.

8.     Defendant Sawyer Media LLC ("Sawyer Media") is a Delaware limited liability company, which has its registered agent as Registered Agent Solutions, Inc., 828 Walker Road, Suite 21-2, Dover, Delaware 19904.

9.     Defendant Marc Luzzatto is the chairperson for NSL Media and is an individual domiciled at 535 S. Norton Avenue, Los Angeles, CA 90020-4610.

10.    Defendant Evan Luzzatto is the CEO and manager for NSL Ventures and is an individual domiciled at 719 Greenwich Street, Apt. 1S, New York, NY 10014-2506.

### FACTS GIVING RISE TO THIS ACTION

**A.    General Allegations**

11.    Plaintiff incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

12.    Plaintiff is an independent entertainment marketing and production company that positions itself as a bi-coastal market leader in public relations and influencer marketing for the entertainment industry, with major segments of its business located in both New York and Los Angeles.

13.    Plaintiff desired to purchase the issued and outstanding membership interests, comprising 100% of the issued and outstanding equity interests, (the "Membership Interests") of Socialyte, LLC ("Socialyte"), a Delaware limited liability company owned by Seller, in consideration for cash and shares of Dolphin's common stock.

14.    Plaintiff's key purpose in entering the MIPA with Defendants was to solidify its position as a bi-coastal market leader in influencer marketing for the entertainment industry. Following the Membership Interests sale, Plaintiff learned that a major element of what attracted Plaintiff to contract with Defendants in the first

place—Defendants' representations related to their strong balance sheet and financial position—was grossly misrepresented.

**B.**   **Acquisition Under the Membership Interest Purchase Agreement**

15.   Effective November 14, 2022, Plaintiff and Defendants entered into the MIPA, through which Plaintiff originally agreed to purchase the Membership Interests ("Acquisition") for a Purchase Price consisting of the Closing Seller Cash Consideration totaling approximately $4,307,413, Dolphin Common Stock totaling approximately 2,031,491 shares (which includes 685,234 shares issued for an incorrect Working Capital Adjustment due to the material misstatements in the Closing Date Balance Sheet, as described below), a promissory note in the amount of $3,000,000, and up to $5,000,000 to be paid in cash and in shares of Dolphin Common Stock ("Original Purchase Price"). *See* Exhibit A, Article II and MIPA Exhibit A.[1]

16.   The Original Purchase Price was subject to adjustment pursuant to the terms and conditions of the MIPA.

17.   The Closing of the Acquisition occurred on November 14, 2022 ("Closing").

18.   The Membership Interests comprise 100% of the issued and outstanding equity interests of Socialyte. *See* Exhibit A, WHEREAS ¶ 1.

19.   Defendants expressly warranted to Plaintiff in the MIPA, *inter alia*, that:

Financial Statements are (including in all cases the notes thereto, if any), accurate, correct and complete, . . . are based on the books and records of the Company (which books and records are in turn accurate, correct and complete), and fairly present in all material respects the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated. The Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that transactions are recorded in a timely manner and

---

[1] All capitalized terms in this Complaint take on the meaning as defined in the MIPA, unless otherwise defined herein. *See* Exhibit A.

as necessary to permit preparation of financial statements in accordance with GAAP and to maintain accountability for earnings and assets.

See Exhibit A, § 4.5(b) ("Financial Statements; Absence of Certain Changes; Undisclosed Liabilities").

20.     Defendants further expressly warranted to Plaintiff in the MIPA, *inter alia*, that:

Books and Records and other financial records of the Company (i) are complete and correct in all material respects and do not contain or reflect any material inaccuracies or discrepancies and (ii) have been maintained in all material respects in accordance with good business and accounting practices. All transactions of the Company have been accurately and correctly recorded in the Books and Records of the Company. At the Closing, all of the Books and Records of the Company will be in the possession or control of the Company.

See Exhibit A, § 4.19 ("Books and Records").

21.     The MIPA provides Plaintiff with very broad indemnification rights. Pursuant to Section 7.2, and subject to the terms of the MIPA, Defendants must indemnify Plaintiff from any and all losses arising out of, *inter alia*, any inaccuracy in or breach of any representation or warranty contained in the MIPA. *See* Exhibit A, § 7.2 ("Seller's Indemnification Obligations").

**C.     Socialyte's Inadequate Financial Information Recordkeeping**

22.     Neither Socialyte, nor either of the Luzzattos, properly maintained the books and records of Socialyte, and such books and records were certainly not "accurate, correct and complete" as expressly warranted in the MIPA.

23.     After the Closing, Plaintiff learned that none of the balance sheet accounts as presented to Plaintiff prior to the Closing by Socialyte and the Luzzattos were accurate, including any of the balance sheet accounts for the balance sheet dated November 9, 2022 ("Closing Date Balance Sheet"), and, shockingly, Plaintiff learned

that there was not a single supporting schedule for any of the Closing Date Balance Sheet accounts.

24.    Specifically, after the Closing, neither Socialyte, nor either of the Luzzattos, provided a reconciliation for any of the five cash accounts on the Closing Date Balance Sheet.

25.    Furthermore, after the Closing, neither Socialyte, nor either of the Luzzattos, were able to provide a simple Accounts Receivable Aging Report as of November 9, 2022, to justify the amount of receivables listed on the Closing Date Balance Sheet.

26.    In fact, after the Closing, Plaintiff learned that many of Socialyte's accounts receivable were several years old with absolutely no support for the balances listed, thereby inflating the Accounts Receivable listed in the Closing Date Balance Sheet by $563,230.

27.    Furthermore, after the Closing, neither Socialyte, nor either of the Luzzattos, were able to provide a single supporting schedule for any of the four categories comprising Other Current Assets on the Closing Date Balance Sheet, representing over $1,000,000 of alleged value.

28.    Furthermore, after the Closing, neither Socialyte, nor either of the Luzzattos, were able to provide an Accounts Payable Aging Report as of November 9, 2022, to justify the amount of payables listed on the Closing Date Balance Sheet.

29.    In fact, after the Closing, Plaintiff learned that for the first six months of 2022, many of Socialyte's accounts payable contained duplicate payments, thereby understating the Accounts Payable listed in the Closing Date Balance Sheet by an astonishing $1,548,442.

30.    Furthermore, after the Closing, neither Socialyte, nor either of the Luzzattos, were able to provide a single supporting schedule to justify the amounts of any of the eight Accrued Expense categories listed on the Closing Date Balance Sheet.
/ / /

31.     Furthermore, most of the Accrued Expense categories listed on the Closing Date Balance Sheet had negative balances, representing a total negative balance of $238,847.37.

32.     After the Closing, Plaintiff learned that the liabilities from the Accrued Expense categories were understated by an unfathomable $1,591,215.

33.     Furthermore, after the Closing, neither Socialyte, nor either of the Luzzattos, were able to provide a single supporting schedule to justify the amounts of any of the six Deferred Revenue categories listed on the Closing Date Balance Sheet.

34.     The utter lack of controls associated with the Deferred Revenue categories were particularly egregious because such accounts often represented pre-payments for services not yet rendered from talent or influencers—in other words, monies that will be owed to third parties.

35.     After the Closing, Plaintiff learned that the liabilities from the Deferred Revenue categories were understated by $274,829.

36.     Furthermore, after the Closing, neither Socialyte, nor either of the Luzzattos, were able to provide a supporting schedule for the General Clearing Account listed on the Closing Date Balance Sheet.

37.     Finally, with errors in literally every asset and liability category listed on the Closing Date Balance Sheet, the amount of equity stated to be in Socialyte was overstated by the cumulative total of such errors.

38.     It took Plaintiff hundreds—if not thousands—of hours over several months to reconstruct the actual state of the Balance Sheet of Socialyte at Closing.

39.     Despite its assurance of, and express warranty to, having an internal control framework, Socialyte did not properly reconcile any of its balance sheet accounts, including its accounts receivable and accounts payable, on a monthly basis and also did not maintain up-to-date supporting schedules for any balance sheet accounts.

/ / /

40.     Simply put, it was inexplicably and unequivocally not a part of Socialyte's closing process, for any period, to maintain any supporting schedules for any balance sheet account.

41.     Socialyte and the Luzzattos hired a new Controller ("New Controller") for Socialyte in July 2022.

42.     Upon information and belief determined by Plaintiff after the Closing, the New Controller replaced a previous Controller whom the Luzzattos fired.

43.     After the Closing, Plaintiff learned that when the New Controller started working at Socialyte, she was not given any supporting schedules for any of the balance sheet accounts from anyone, including the previous Controller or the Luzzattos; such supporting schedules simply did not exist.

44.     The New Controller was not involved in preparing Socialyte's Audited Financial Statements dated for the years ended December 31, 2021 ("YE 2021 Audited Financial Statement") and December 31, 2020 ("YE 2020 Audited Financial Statement") that were presented to Plaintiff prior to Closing.

45.     As would be expected, since neither the previous Controller, Socialyte, nor either of the Luzzattos, had any internal controls or supporting schedules for any balance sheet accounts, after the Closing, Plaintiff learned of numerous errors in the YE 2021 Audited Financial Statement and in the YE 2020 Audited Financial Statement.

46.     No one at Socialyte, including the Luzzattos, ever informed either the previous Controller or the New Controller, of the plan to sell Socialyte.

47.     The Luzzattos, if asked the purpose of the information requests by either the previous Controller or the New Controller, simply stated that it was either a "routine review" or was necessary for a "re-financing" of the company.

48.     Furthermore, after the Closing, Plaintiff learned that the Closing Date Balance Sheet presented by the Luzzattos to Plaintiff was requested of the New Controller by the Luzzattos (i) without any context; (ii) without asking if the

information given was reconciled; and, in fact (iii) without asking if she had completed the October 31 month end close, which she had not.

49.    The intentional and/or reckless disregard of the Luzzattos in failing to present accurate financial statements, including the Closing Date Balance Sheet, is shocking.

50.    All things considered, the Defendants violated their express warranty that Socialyte "maintains a system of internal accounting controls sufficient to provide reasonable assurance that transactions are recorded in a timely manner and as necessary to permit preparation of financial statements in accordance with GAAP and to maintain accountability for earnings and assets."

51.    In fact, without a single supporting schedule for any of the Balance Sheet accounts, there were no internal accounting controls in place at all.

52.    As such, every single one of the financial statements presented to Plaintiff by Socialyte and the Luzzattos prior to entering into the MIPA failed to "fairly present in all material respects the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated."

53.    Furthermore, each of the Defendants, including Socialyte and the Luzzattos, wantonly disregarded their express warranty that the "Books and Records and other financial records of the Company (i) are complete and correct in all material respects and do not contain or reflect any material inaccuracies or discrepancies and (ii) have been maintained in all material respects in accordance with good business and accounting practices. All transactions of the Company have been accurately and correctly recorded in the Books and Records of the Company."

54.    As a result of the inadequate recordkeeping of important financial information outlined above, Seller grossly misrepresented Socialyte's financial position for the working capital adjustment, the relevant audited financial statements, and the company's goodwill, all to the severe detriment of Plaintiff.

**D.**   **Seller Grossly Misrepresented Its' Financial Position Regarding the Working Capital Adjustment**

55.   All the Defendants, including Socialyte and the Luzzattos, vastly misrepresented the working capital in Socialyte on the day of closing for the benefit of the Seller.

56.   The Closing Date Balance Sheet represented, for example, that, *inter alia*, the Total Accounts Receivable was listed as $3,425,861.37, and the Total Accounts Payable was listed as $1,343,840.45, indicating that the Accounts Receivable were more than double the Accounts Payable. *See* Exhibit A, MIPA Exhibit B.

57.   Both the Total Accounts Receivable and the Total Accounts Payable were incorrect and materially misstated, to the point where the accurate Accounts Payable were actually greater than the actual Accounts Receivable.

58.   At least one account, titled "Miscellaneous," had a balance of $491,132, for which there was no support and no way of collecting.

59.   Both the Luzzattos supplied virtually all of the financial information to Plaintiff prior to closing, and were acutely aware of the material misstatements, the lack of internal controls, and the utter lack of supporting documents for literally every balance sheet account.

60.   Based on the representations made by Socialyte and the Luzzattos, along with the representations contained in the Closing Date Balance Sheet, Plaintiff paid Seller approximately $2 million of a working capital adjustment by issuing 684,234 shares of its common stock on the Closing Date.

61.   After the Closing Date and within the time prescribed by MIPA, Plaintiff prepared an updated Closing Date balance sheet and found that Socialyte did not maintain reconciliations or supporting schedules for any of its balance sheet accounts, and that the Closing Date Balance Sheet had significant errors, including:

a.   The asset of Accounts Receivable was overstated by $563,230;

b.   The liability of Accounts Payable was understated by $1,548,442;

c.     The liability of Accrued Expenses was understated by $1,591,215; and

d.     The liability of Deferred Revenue was understated by $274,829.

62.    The misstatements in the Closing Date Balance Sheet provided to Plaintiff, and on which Plaintiff relied when making its additional payment to Defendants for the Working Capital Adjustment, resulted in an overpayment to Defendants of at least $3,329,058.

63.    In total, the working capital adjustment should have been at least $1,273,356 in favor of Plaintiff instead of approximately $2 million in favor of Defendants.

64.    Accordingly, the Original Purchase Price paid by Plaintiff exceeded the value of Defendants' business unit.

65.    Defendants are responsible for compensating Plaintiff for any resulting difference attributable to the material misstatements within the Defendant's financial records.

**E.**   **<u>Seller Grossly Misrepresented Its' Financial Position</u>**
       **<u>Regarding the Audited Financial Statements</u>**

66.    Around the time of the Closing Date, Seller provided Plaintiff with both the YE 2021 Audited Financial Statement and the YE 2020 Audited Financial Statement (collectively, "Inaccurate Audited Financial Statements").

67.    Both Inaccurate Audited Financial Statements contained numerous errors that inflated the financial position of Socialyte.

68.    For example, among the many YE 2021 Audited Financial Statement errors:

a.     The asset of Accounts Receivable was understated by $458,401;

b.     The liability of Accounts Payable was understated by $870,216;

c.     The liability of Accrued Expenses was understated by $1,178,368;

d.     The liability of Deferred Revenue was understated by $138,667; and

e.     Members' Deficit was understated by $1,728,850.

69.     For example, among the many YE 2020 Audited Financial Statement errors:

    a.    The asset of Cash was overstated by $44,977;

    b.    The asset of Property and Equipment were overstated by $35,941;

    c.    The liability of Accounts Payable was understated by $170,050;

    d.    The liability of Accrued Expenses was understated by $1,577,352; and

    e.    Members' Deficit was understated by $1,655,293.

70.     In total, the errors in the Inaccurate Audited Financial Statements harmed Plaintiff by approximately $3,384,143, which amounts are recoverable under the MIPA.

**F.     Goodwill Impairment**

71.     In or around May 2023, Plaintiff performed a goodwill impairment test of its assets, including Socialyte.

72.     Based on the revised financial history and Closing Date Balance Sheet of Socialyte, along with the accurate 2022 operating results of Socialyte, Plaintiff provided revised projections that resulted in an impairment of Socialyte's goodwill in the amount of $6.5 million.

73.     Additionally, during routine testing on or around October 1, 2023, Plaintiff performed a second goodwill impairment test that resulted in an additional $3 million impairment of Socialyte's goodwill.

74.     Neither Socialyte nor the Luzzattos maintained proper accounting records or properly reconciled books, resulting in errors of magnitude in the financial results represented and expressly warranted by the Defendants, including Socialyte and the Luzzattos; these errors caused a goodwill impairment of approximately $9.5 million less than one year of the Closing Date and led Plaintiff to significantly overpay for Socialyte.

75.     These damages form the basis of this Complaint.

/ / /

/ / /

## COUNT I

### Breach of Contract

76.     Plaintiff incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

77.     The MIPA is a binding contract between Plaintiff and Defendants.

78.     The MIPA entered into by and between Plaintiff and Defendants contained representations about Socialyte's financial position.

79.     The representations made by Defendants were false, and as such, constitute a breach of the MIPA.

80.     At all times, Plaintiff performed all of its obligations required under the MIPA, including paying Defendants the full Original Purchase Price and the grossly misrepresented Working Capital Adjustment.

81.     As a direct and proximate result of the aforesaid conduct by Defendants, Plaintiff has suffered economic harm, including, but not limited to, overpaying for the Membership Interests, paying closing costs and associated fees related to the MIPA—including costs and fees after the MIPA was executed related to discovering the fraudulent conduct—the loss of use of money that was provided to Defendants, the interest associated with the loss of use of the money, and all consequential damages. The exact amount of losses is greater than $75,000 and will be stated according to proof at trial.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in favor of Plaintiff and against Defendants, together with compensatory damages, actual damages, incidental damages, interest, and an award of attorneys' fees and other fees and costs pursuant to the MIPA and where allowable by law, in addition to such other and further relief as this Court deems just and proper.

/ / /

/ / /

/ / /

1

## COUNT II

2

## Declaratory Judgment

3      82.     Plaintiff incorporates by reference the allegations in the paragraphs above

4   as though fully set forth herein.

5      83.     As a result of Defendants' breach of the relevant MIPA provisions outlined

6   above, Plaintiff seeks declaratory relief that Defendants are not entitled to the Original

7   Purchase Price, but instead owe Plaintiff reimbursement as well as damages resulting

8   from the inaccurate and misstated financial information.

9      84.     This is a controversy involving the rights or other legal relations between

10  Plaintiff and Defendants as it relates to the Acquisition.

11     85.     All parties with an interest are before this Court.

12     86.     Both Plaintiff and Defendants are claiming rights or legal interest in the

13  Original Purchase Price and are contesting one another's claim thereto.

14     87.     By reason of the controversy alleged above, the parties are in doubt as to

15  their rights and obligations under the MIPA.

16     88.     The controversy is between parties with real and adverse interest and the

17  issue is ripe for judicial declaration.

18     WHEREFORE, Plaintiff respectfully requests that this Court grant declaratory

19  relief in favor of Plaintiff and against Defendants as set forth above, in addition to such

20  other and further relief as this Court deems just and proper.

21

## COUNT III

22

## Indemnification (Express and Common Law)

23     89.     Plaintiff incorporates by reference the allegations in the paragraphs above

24  as though fully set forth herein.

25     90.     Under the terms of the MIPA, Defendants expressly agreed to indemnify

26  Plaintiff against costs and expenses incurred as a result of Defendants' failure to comply

27  with the MIPA. *See* Exhibit A, § 7.2.

28  / / /

91.     As detailed above, Plaintiff has incurred costs and expenses as a result of Defendants' breach of the representations and warranties and are entitled to indemnification under the MIPA.

92.     Although the right to indemnification frequently arises out of express contracts to indemnify, it can also be based on an implied contract or can be imposed by law resting on equitable principles of restitution and unjust enrichment.

93.     As between Plaintiff and Defendants, the costs and expenses incurred by Plaintiff as a result of Defendants' failures and misconduct, as described above, should have been incurred by and/or should be incurred by Defendants.

94.     Accordingly, under Defendants' express contractual obligations to indemnify Plaintiff, and under Delaware's common law principles of indemnification, Defendants are obligated to indemnify Plaintiff.

95.     Plaintiff expects additional claims for damages as a result of Defendants' breaches and wrongdoing, which will be proven at trial.

96.     Defendants are responsible for any resulting damage, including the costs, expenses, and other damages to be determined at trial, as a result of Defendants' breach of the MIPA.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in favor of Plaintiff and against Defendants, together with compensatory damages, actual damages, incidental damages, interest, and an award of attorneys' fees and other fees and costs pursuant to the MIPA and where allowable by law, in addition to such other and further relief as this Court deems just and proper.

## COUNT IV

## Fraud

97.     Plaintiff incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

98.     As detailed above, Socialyte and the Luzzattos knowingly made false representations to Plaintiff with the intent of inducing Plaintiff to purchase Socialyte.

99.  Plaintiff relied on the misstated financial statements and other false representations made by Socialyte and the Luzzattos described above justifiably and to its detriment.

100.  As a result of the false representations made by Socialyte and the Luzzattos, and Plaintiff's justifiable reliance on those representations, Plaintiff purchased Socialyte at a price severely overstated and to the detriment of Plaintiff.

101.  Defendants are responsible for any resulting damages, including punitive damages, and other damages to be determined at trial, resulting from Defendants' fraudulent representations and activities.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in favor of Plaintiff and against Defendants, together with punitive damages, compensatory damages, actual damages, incidental damages, interest, and an award of attorneys' fees and other fees and costs pursuant to the MIPA and where allowable by law, in addition to such other and further relief as this Court deems just and proper.

## COUNT V

### Negligence

102.  Plaintiff incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

103.  Both the Luzzattos had a duty under the MIPA and relevant financial accounting standards to ensure that the books and records of Socialyte were accurate and properly reconciled.

104.  Both Socialyte and the Luzzattos breached their duty to ensure that the books and records of Socialyte were accurate and properly reconciled by failing to provide the previous Controller and the New Controller with all pertinent financial information, including information relating to the plan to sell Socialyte; failing to supervise the previous Controller and the New Controller; and failing to ensure the financial accuracy of the books, records, and financial statements of Socialyte.

/ / /

**COMPLAINT**

105.    The Luzzattos, as a result of the breaches described above, harmed Plaintiff by causing it to significantly overpay for the purchase of Socialyte.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in favor of Plaintiff and against Defendants, together with compensatory damages, actual damages, incidental damages, interest, and an award of attorneys' fees and other fees and costs pursuant to the MIPA and where allowable by law, in addition to such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Honorable Court enter Judgment in its favor, and against Defendants for:

A.      Any and all punitive, compensatory, and incidental damages;

B.      Actual damages, including but not limited to the amount by which the Original Purchase Price paid by Plaintiff exceeded the value of Defendants' business unit and the costs of this action and benefit of the bargain damages;

C.      All costs, fees, interest, and expenses incurred by Plaintiff as the result of Defendants' breach of the MIPA;

D.      Declaratory relief as requested in Count II;

E.      An award of attorneys' fees to the extent allowed by law and/or as provided for by the MIPA; and

F.      All other relief at law and equity, and which this Court deems fair, just and proper.

Respectfully Submitted,

Dated:  June 12, 2024

**K&L Gates LLP**

By:    */s/ Daniel M. Glassman*
        Daniel M. Glassman
        Lea E. Gierut
        Steven L. Caponi
        Falco A. Muscante II

        *Attorneys for Plaintiff Dolphin*
        *Entertainment, Inc.*

17
**COMPLAINT**

1

## **DEMAND FOR JURY TRIAL**

2      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Civil Local

3   Rule 3-6(a), Plaintiff Dolphin Entertainment, Inc. requests a trial by jury of all issues

4   and claims for relief so triable.

5

6                                  **K&L Gates LLP**

7   Dated:  June 12, 2024          By:   */s/ Daniel M. Glassman*
                                        Daniel M. Glassman
8                                        Lea E. Gierut
                                        Steven L. Caponi
9                                        Falco A. Muscante II

10                                       *Attorneys for Plaintiff Dolphin*
                                        *Entertainment, Inc.*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28